282 So.2d 237

R. R. SANDERS

v.

Martha P. BARRON.

S.C. 327.

Supreme Court of Alabama.

Aug. 30, 1973.

W. H. Baldwin, Andalusia, for appellant.

J. M. Albritton, Andalusia, for appellee.

HARWOOD, Justice.

The complainant-appellee here filed a bill of complaint in the Circuit Court of Covington County, Alabama, in Equity, praying for a temporary restraining order to restrain the appellant from foreclosing a mortgage executed by appellee and her husband and praying that on final hearing of the cause that the court would ascertain the validity of the mortgage and determine the true amount due to the appellant under the mortgage.

The mortgage which is the basis of this action is the last of four mortgages purported to have been signed by appellee and her husband. The four mortgages were received in evidence. The property mortgaged in all the mortgages was 85.3 acres of land in Covington County and the home thereon, which complainant had inherited from her family.

The first of such mortgages was in the amount of $12,000, which the appellee testified was to be used to renovate their home. The mortgage was dated March 30, 1965, and the mortgagee was the First Mortgage Company Inc. On the same day First Mortgage Company assigned the mortgage to Loyal American Life Insurance Company and this instrument stated that the interest was 6½%. Appellee testified that she signed the mortgage at the insistence of her husband and that no more than $6,500 was expended for the improvement of their home.

On October 19, 1966, there was executed a mortgage in the amount of $2,700. The mortgagee was R. R. Sanders, the appellant in this cause, and the purported mortgagors were the complainant and her husband Fred Barron. Mrs. Barron, the complainant, testified that she did not join her husband in this mortgage and that her name was forged thereto.

An examination of the document shows that the signatures were acknowledged before Fred Barron, appellee's husband and cosigner of the mortgage. Mrs. Barron further testified that her husband abandoned her in February of 1970, and that she did not learn of the $2,700 mortgage until after the execution of the two subsequent mortgages hereinafter mentioned. Mrs. Barron stated that while attempting to locate her husband, she later talked with the respondent, Mr. Sanders by telephone and that during that conversation Mr. Sanders said that he had thought her name was forged and that was the reason that he loaned Fred more money because it was the only way he would be able to get his money out of "that first mortgage," i. e., the $2,700 mortgage.

Regarding the next mortgage, Mrs. Barron testified that her husband suggested that they sign a mortgage for about $15,000, therein consolidating all their outstanding debts. Mrs. Barron stated that upon arriving at the attorney's office to sign the mortgage she learned for the first time that the actual amount of this mortgage was $18,250. The mortgagee was R. R. Sanders and the terms of the mortgage provided for payments in monthly installments of $196.12 for 180 installments. This instrument did not specify a rate of interest and was executed on January 13, 1970 by Fred Barron and Martha Barron. Mrs. Barron testified that she signed the mortgage because her husband told her that she would lose the farm if she did not sign it. No money changed hands at the execution of this mortgage. However, Mrs. Barron testified that she later learned that the attorney who prepared the mortgage received and paid out $14,928.64 and she was furnished a copy of the bills reflecting how the money was paid out. The balance of $10,440.21 due on the mortgage assigned to the Loyal American Life Insurance Company by the First Mortgage Company, was among the items paid by Mr. Murphy out of the $14,928.64 advanced by the appellant.

Ten days later, on January 23, 1970, Mrs. Barron signed a mortgage of $20,514.64. This mortgage dated January 13, 1970, also provided for 180 monthly installments at $196.12 each and, additionally, contained the notation, "Interest being amortized at 8%." This mortgage, too, was dated January 13, 1970, and was represented to Mrs. Barron to be a correction mortgage in place of the previous mortgage she had signed on January 13, 1970. No additional money was received by the mortgagors.

Mrs. Barron asserted that she signed these mortgages at her husband's insistence and that he was the dominant figure in their household. Mrs. Barron further stated that she had never personally met R. R. Sanders before the trial; had had no business dealings with him; and did not know that her husband had had prior dealings with Mr. Sanders at the time she executed the mortgage.

Miss Sherrell Raley, the daughter of Mrs. Barron, testified that she had lived in the home of Fred and Martha Barron during this period and had observed the relationship between her mother and Fred Barron to which her mother had testified. Miss Raley stated that, in addition to being the dominant figure in the marriage relationship, Fred Barron told her mother that she would lose the farm if she did not sign the last two mortgages, and that if she did not sign them he would leave her.

Mr. Ray Murphy, the attorney who prepared the last two mortgages, testified that he received $14,928.64 from the respondent and that he disbursed the total amount. He testified that those were the only funds

to come into his hands. Mr. Murphy stated that at the time he prepared the mortgage in the amount of $18,250 he prepared a cancellation of the $2,700 mortgage and based on that transaction he concluded that the debt of $2,700 was included in the $18,250 mortgage. After Mr. Murphy had paid out the entire $14,928.64 from a trust account which he had established, he learned that the check he had received from Mr. Sanders for that amount had a stop payment order on it. Mr. Murphy was informed that Mr. Sanders had proposed to transfer the mortgage to a bank for collateral but the bank would not take it without a disclosure statement and a right of rescission statement, and "would not take it with the payments of $196.12 for 180 installments showing the $18,250.-00." The bank did not indicate why they would not accept those figures. Mr. Murphy stated that at this point either Mr. Sanders or Mr. Barron gave him the figures for the mortgage of $20,514.64. He further testified that no additional money changed hands, and that in his opinion the difference between the $18,250 mortgage indebtedness and the $20,514.64 indebtedness was the difference between 8% and 10% interest.

Mr. R. R. Sanders testified that he let Fred Barron have some money in October of 1966 but he did not recall the exact amount, but said that the figure would have included 8% interest. He stated that he did not have his records of that transaction. Next, Mr. Sanders stated that he remembered that sometime after that he gave Fred Barron some cash. He did not remember exactly when nor how much, but in his best judgment it was about $1,500. He did not have any records to substantiate this transaction either, stating that when all these debts were consolidated in the mortgage of January 13, 1970, he got rid of his previous records. Mr. Sanders stated that these debts were lumped together to arrive at the $18,250 figure. He added that Mr. Barron or possibly Mr. Murphy supplied the figures for the mortgages

and that he did not perform any calculations. Mr. Sanders said that the interest was included in the figures for the $18,250 mortgage. He denied admitting to Mrs. Barron in a telephone conversation that he suspected that her name had been forged on the $2,700 instrument. Mr. Sanders said that to his best recollection Fred Barron had made four payments of $196.12, but he did not have his records regarding that.

After Fred Barron missed a number of payments, Mr. Sanders attempted to locate him. Mr. Sanders testified that while attempting to locate Fred Barron, he talked with Mrs. Barron and that during this conversation Mrs. Barron informed him that Fred had left her and it was his understanding that Mrs. Barron agreed to assume the payments for the monthly amounts. Mr. Sanders said she never made any of those payments and some few months later he started the foreclosure proceedings which were enjoined by this suit. Mrs. Barron denied she had ever agreed to make the monthly payments on the mortgage, and in fact had no funds out of which such payments could have been made.

The trial court found that the mortgage in the amount of $2,700 was a forgery insofar as the appellee was concerned and formed no part in the consideration of the final mortgage, and that the actual monies received were in the amount of $14,928.64. The court ordered appellee to pay $14,928.64 plus an attorney's fee in the amount of $550.00 for respondent's attorney, the cost of the foreclosure sale, and the court costs. No credit was given to the complainant for the four payments of $196.12 each that Fred Barron had made. The court made no finding as to usury. From this decree the respondent perfected this appeal.

Appellant on appeal maintains that he should be allowed the entire amount of the debt or that the cause be reversed allowing him the contracted rate of 8% interest on the $14,928.64 until the date of the decree

and 6% interest from that time forward. Next, appellant insists that the $2,700 debt is valid and should be allowed as a part of the mortgage indebtedness involved in this suit.

Speaking first to the matter of the $2,700 indebtedness, it would appear that the instrument evidencing that transaction is void. One interested in a conveyance may not take and certify the acknowledgment of one of the grantors. Swindall et al. v. Ford, 184 Ala. 137, 63 So. 651. As stated in Byrd v. Bailey, 169 Ala. 452, 53 So. 773, it was said in reference to an interested party taking an acknowledgment:

"* * * the act to be done [taking an acknowledgment] implies two parties. No man can be a judge in his own cause. The deed in question was void. Davis v. Beazley, 75 Va. 491."

This rule, in addition to the testimony taken at trial indicating that the signature of Mrs. Barron was forged and the subsequent finding of the trial judge who heard the testimony, makes it clear that the $2,700 should not be included as a part of this mortgage indebtedness.

As to the $1,500.00, the appellant offered no documentary proof at trial as to the creation and existence of an indebtedness in that amount, and his testimony as to his loan is not too clear.

Even so, in brief counsel for appellant contends:

"In addition to the $2,700.00 mortgage, the Respondent testified as to another $1,500.00 loan made directly to James F. Barron. This $1,500.00 loan, the interest thereon, and the interest on the $2,700.00 mortgage were totalled to make the figure of $5,586.00 reflected in the renewal or extension line on the Direct Loan Disclosure Statement executed by Complainant. Respondent feels very strongly that the entire $5,586.00 should have been secured by the other indebtedness clause. He did, however, misplace his records on the $1,500.00 loan, and since it could have been barred by the statute of limitations at the time the mortgage in question was executed, he has assigned no error relating to this loan.

"In conclusion the Respondent, Appellant, respectfully submits that this Honorable Court should enter a decree allowing him the proper amount of his debt, or reverse the cause with instructions to the Trial Court to allow Appellant his interest and his $2,700.00 other indebtedness."

Since appellant apparently makes no contention that the court erred in not including the $1,500 debt as part of the debt the Chancellor found to be owed by the appellee, this leaves for consideration only the matter of whether the Chancellor erred in not including the $2,700 in the amount he found due under the mortgage.

We have already reached the conclusion that the $2,700 mortgage was void as to the appellee. The Chancellor was therefore correct in his determination as to the true amount owed by the appellee.

Further, it would appear that appellant having testified that both the $1,500 and the $2,700 loans with interest were included in the $18,250 mortgage, we can find no basis for permitting these amounts to be used a second time to arrive at the figure of $5,586 which was reflected in the Direct Loan Disclosure Statement executed by the appellee. Such allowance would merely compound the error of including these two items in fixing the amounts actually loaned by appellant to the appellee.

The Chancellor found, and we think correctly so under the evidence, that the true consideration for the mortgage of January 13, 1970, was the $14,928.64 furnished to Mr. Murphy, the attorney, for the purpose of paying previous debts of the Barrons, and consolidating the amount of the debts into the mortgage of January 13, 1970.

The repayment of this amount by 180 monthly installments of $196.12 would, ac-

cording to our calculations, of necessity include usurious interest.

Upon the execution of the mortgage of January 13, 1970, in the amount of $18,250.00, the mortgage of $2,700.00 which Mrs. Barron testified her signature was forged, was canceled. The only reasonable inference that can be drawn from the cancellation of the $2,700.00 is that the mortgage debt was included as a part of the debt secured by the $18,250.00 mortgage.

In fact the appellant testified that the $2,700.00 and also the $1,500.00 which he claimed to have loaned Fred Barron were included in the $18,250.00 mortgage of January 13, 1970.

■ Certainly the usurious taint could not be removed from the $18,250.00 mortgage of January 13, 1970, by the attempted expedient of increasing the mortgage debt to $20,514.64 as was done in the so-called corrective mortgage which was executed on 23 January 1970, though dated January 13, 1970.

■ Counsel for appellant argues that because the mortgage of January 13, 1970 contained a provision that it secured "any other indebtedness" of the mortgagors, the $2,700.00 mortgage at least should be considered as a part of the debt secured under the mortgage of January 13, 1970. Counsel for appellant cite First National Bank of Guntersville v. Bain, 237 Ala. 580, 188 So. 64, in support of this contention.

In the present case, the Chancellor found that Mrs. Barron's signature to the $2,700.-00 mortgage was a forgery. Further the $2,700.00 mortgage was additionally void for the reason that the acknowledgment of Mrs. Barron's purported signature was taken before Fred Barron, an interested party. Either or both of these factual situations would prevent the $2,700.00 mortgage from being considered as a debt of Mrs. Barron having an existence at any time.

We further note that in *Bain,* supra, the court pointed out:

"It is a well recognized rule that the consideration of a note or mortgage is open to full inquiry."

The Chancellor decreed that the appellee pay to the Register the sum of $14,928.64, the actual amount loaned by the appellant, plus certain other costs, including a reasonable fee to appellant's attorney.

The Chancellor recited in his decree:

"The Court makes no finding as to whether the mortgage involved in this litigation is usurious or not for the reason that the Court is of the opinion that there were payments made by the Complainant to the Respondent which were probably sufficient to pay the interest on the principal amount advanced by the Respondent, * * *"

■ While the court made no finding as to usury, the evidence tends to show that the mortgage for $18,250.00 was usurious. This being so, the appellant was entitled to recover only the principal sum borrowed. Section 65, Title 9, Code of Alabama 1940.

No cross-appeal was made in this case. We do not therefore consider whether the appellee was actually liable for the amounts awarded the appellant in the decree. We are clear to the conclusion, however, that the evidence was entirely sufficient to support the decree insofar as the attack made on it by the appellant is concerned. Particularly is this true if the usual presumption of correctness be accorded the findings and conclusions of the Chancellor made after an ore tenus hearing.

Affirmed.

All the Justices concur.